FREEMAN & BROWNE v. DIETERT BROS.*
(No. 7036.)

(Court of Civil Appeals of Texas. San Antonio. Jan. 30, 1924. Rehearing Denied Feb. 27, 1924.)

1. Continuance ⬤➡7—Granting continuance is largely discretionary.

In the granting or refusing of a continuance the trial court is allowed wide discretion.

2. Continuance ⬤➡30—Refusal to grant continuance on ground of surprise by reason of amendment held not abuse of discretion.

In an action for rental of pasture, in which defendant admitted contract of pasturage but set up a cross-action for damages, based on plaintiff's alleged breach of contract to furnish water for cattle, though plaintiff then filed an amended petition alleging they had not obligated themselves to furnish water in the face of any emergency that might exist, refusal to grant defendant's motion for continuance on the ground of surprise was not abuse of discretion.

3. Animals ⬤➡25—Evidence held insufficient to show breach of contract for pasturing.

In an action for rental of pasture for certain months, evidence held insufficient to show plaintiffs breached their contract to furnish water for defendants' cattle or that the cattle suffered any damages from lack of water.

4. Evidence ⬤➡471(25)—Testimony as to insufficiency of water supply for cattle and consequent damage being in nature of conclusions held properly excluded.

In an action for rental of pasture, in which defendants set up a cross-action alleging damages to the cattle by reason of plaintiff's alleged breach of contract to furnish water for cattle, testimony of one of defendants as to insufficiency of water supply and consequent damage, being in the nature of conclusions, held properly excluded.

Appeal from District Court, Kerr County; R. H. Burney, Judge.

Action by Dietert Bros. against Freeman & Browne. Judgment for plaintiffs, and defendants appeal. Motion for rehearing granted, and judgment affirmed.

Lee Wallace, of Kerrville, and Hal Browne, of San Antonio, for appellants.

Taliaferro, Cunningham & Moursund, of San Antonio, H. C. Geddie, of Kerrville, and W. B. Jack Ball and T. B. Moursund, both of San Antonio, for appellees.

SMITH, J. In the original disposition of this cause the appeal was ordered dismissed. That order will now be set aside, the opinion written thereon will be withdrawn, and the following substituted therefor:

Appellants have stated the nature and result of the suit in this way:

"This cause was tried in the district court of Kerr county on February 7, 1923. The plaintiff's original petition was filed March 15, 1922; plaintiffs being Dietert Bros., a firm composed of T. F. W., E. E., E. D., and Ernest Dietert. The defendant is the firm of Freeman & Browne; J. P. Freeman and N. H. Browne being the component members thereof. The Stockyard Loan Company was originally a defendant, but was dismissed.

"Plaintiff sued defendant to recover for rental on pasture up to December 1, 1921, and for quantum meruit alleged to be due for pasturing cattle belonging to defendants, from that time until the middle of March, 1922.

"The original answer of the defendants was filed July 25, 1922, and in that original answer they admitted that their cattle were in plaintiff's pasture, under a contract of pasturage,

⬤➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction April 16, 1924.

but set out that the plaintiffs had negligently and willfully failed and refused to furnish water for the cattle to drink, whereby the cattle were damaged to the extent of $10 per head, and there were 1,500 head of cattle in the pasture, and they reconvened for damages in the sum of $15,200.

"On the 7th of February, 1923, the plaintiffs filed an amended petition, in which it was alleged that plaintiffs had not 'obligated themselves to furnish water in the face of any emergency that might exist.' Thereupon plaintiffs (defendants) made motion for continuance on the ground of surprise, which was overruled; * * * and the court proceeded to instruct the jury to find for the plaintiffs on their suit and against the defendants on their cross-action, and the jury found for plaintiffs in the sum of $4,742.95 and against the defendants on their cross-action. Judgment was rendered on this verdict."

[1, 2] Appellants complain in their second assignment of error of the refusal of the court to continue the cause upon appellants' application. In the granting or refusal of continuance the trial court is allowed a wide discretion, which is by no means shown to have been abused in this cause, and the assignment mentioned is overruled.

In their sixth assignment of error appellants complain of the action of the court in directing a verdict against them. This requires a consideration of the evidence, and if it appears that there is any testimony upon which the jury could properly have rendered a verdict for appellants, the peremptory action of the court constituted reversible error, of course. The test of the sufficiency of the evidence is: Was it shown that appellees breached their contract to supply appellants' cattle with water during the months of July, August, and September, 1921? If so, did such breach result in actionable injury to the cattle? And if so, was the resulting damage shown with sufficient certainty to warrant the jury in finding a particular amount as compensation therefor? We will discuss only the affirmative evidence upon these three points.

[3] According to their own testimony, appellants had been pasturing their cattle in the pasture in question for a number of years and up to the time the contract involved here was entered into. They were entirely familiar with grass and water conditions in the pasture, and with the number, location, capacity, and habits of the watering places therein. With this knowledge they assumed the duty of looking after and salting the cattle while so pastured, and of "drifting" them between watering places, two of which were dependent upon windmills for pumping purposes, and two upon gasoline engines. Unless the wind was blowing with sufficient force to propel the windmills, the water supply dependent on those mills failed, whereby the cattle were relegated to the other two wells, where the supply was pumped by engines. Appellants knew of these conditions when they made the pasturage agreement in question, and employed one Snodgrass to "drift" the cattle between wells as their necessities required. Snodgrass testified that, while because of light winds but little water was available at the windmills, water was always obtainable at one or both of the other wells; that on occasions he absented himself from the pasture for a day or two at a time, and upon his return in several instances found the water cut off at one well, and in one instance at the other well, and three or four times at the "headquarters ranch" the cattle "would be standing around the water troughs trying to get water, and looked drawn and hollow like they had not had anything to eat or drink. I opened the gates and took the rocks out from under the float, which had been done to shut the water off, putting rocks under it so it would not run in. * * * When I took the rocks out from under the float, the cattle would crowd around the trough to drink. * * * I never did find the water cut off at the other ranch, at the other pump, but one time. * * * There were cattle around there, several hundred head of cattle. They did not seem to be suffering for water. I opened the gates and they drank."

The foregoing embraces the strongest testimony of this witness as to the water failure, and the consequent injury to the cattle. The effect of it is that water was always available, and although at one well or another the flow was sometimes cut off, the witness turned it on at will, when it flowed in abundance. The jury could not, from this evidence, find that appellees breached their agreement to furnish water for appellants' cattle, or that the cattle suffered enough from lack of water to definitely injure them then or thereafter. The only other witness as to these facts was appellant Freeman. He testified that he knew the condition of the wells, at the time he made this contract, and that two of the wells must depend on the wind for water, and that he "gave orders to try to keep the cattle scattered as well as we could." He further testified:

That "in July and August the cattle were in very good shape"; that he did not go to the ranch until about the last of July, when he found that at one of the wells the engine was out of repair, that 500 or 600 cattle were standing around the well and "looked drawn." This engine was promptly repaired and the water supply renewed, when the witness went onto the headquarters ranch, where he "found the water low." This was about July 30th, and "the next time I remember was some 20 or 30 days later. I rode over and found the conditions I described a while ago. I don't recall any other particular time that I was at the well." That "the first time I as at the wells you might say there was no water in the pasture, but we got the engine started and got it to pumping water. The last time I was there there was

water at the house (headquarters) and also water at the Ford well, but none at the other two wells at the north side of the pasture." That they were dipping the cattle every 18 days during the summer. That although 30 days may have elapsed between his first and second visits to the ranch he was there every 8 or 10 days thereafter. That "it was some time in July when I saw the Dietert boys trying to pump; I don't remember the date. I went to the Ford well and to the headquarters ranch on that trip. I didn't look at the other well at that time."

"The first trouble I had with the water was about the last of July. * * * After my first visit there in July, I don't know how much time elapsed before my second visit there. I went there and helped them to dip. Twice I stayed there during the full dipping, and then I stayed there two or three times. * * * As to the time that elapsed between those visits there, there would be anywhere from 5 or 6, maybe 8 or 10, days before I would go back. It might have been 30 days between the first and second visits that I made to the wells and it could have been longer. * * *

"They were watering at the Ford ranch and at the headquarters ranch at that time, the only places that I found any water to amount to anything. Maybe a windmill would be pumping and the cattle would be standing around sucking between times. It wasn't the business of the Dieterts to drive these cattle to the different wells, but it was their business to keep water at these different wells so they could get water. They told me they would furnish water and grass for the cattle and I would give them two bits a head.

"They nearly always ran out of water. I don't think that we ever finished up dipping that we were not low on our water when we got through, at the headquarters ranch. * *. *

"It was in July, August, and September that these cattle were damaged from lack of water, and October and November, on up, every time I was there. I was there once at the well and drifted these cattle away from there; I wasn't up there three or four days continuous, but I was there two days and three or four different times. * * *

"If cattle don't find water around the windmill, they will strike out and go to another one.

"I was all over the ranch at times that summer, and I helped to gather the cattle. I rode all over it. I was there eight times and saw them, and then I went there twice and drifted these cattle, and I went there once and took care of the place and saw the cattle, and then I helped to dip them four or five times more. I found them suffering for water every time I was there. I didn't find water at those mills. Sometimes the wind would be blowing and the cattle would be sucking up the water, and some of the largest cattle would get water, but the weakest would not get any water at all. The mills were all right, but there was no wind to pump the water. I don't think I ever saw any water at any time I went there, only just a little in the trough or tank; some days the stoutest cattle would get water.

"All of the cattle that I found at those two wells were in a drawn condition. It is hard to tell how many cattle would be around a well; I never counted them; maybe 200 or 300 cattle hanging around. Maybe there would be 400 or 500 or 600, different numbers at different times. We didn't have any certain amount that watered at each well every day."

Analyzing the foregoing testimony of both Snodgrass and Freeman, which embraces the strongest of appellants' evidence upon the subject, and which is in substance contradicted by several witnesses, it will be readily seen that there was no time that appellants could not find water for their cattle by "drifting" them as contemplated in the agreement between the parties. Nor is there evidence from which a jury could properly have found that by reason of water shortage the cattle suffered injuries which resulted in damages for which appropriate compensation could have been ascertained.

The evidence was equally insufficient upon the question of the measure of damages. Appellant Freeman testified that "the greatest growing period for a young steer I think is in June and July, and then I believe September and October they show more growth than in any other two months," but that "these steers did not show any growth during the months of June, July, August, and September and October, 1921," although "in July and August, 1921, they were in very good shape." The period in controversy here was in July, August, and September, 1921, and the failure of the steers to get any growth in June or October or November could not in any event enter into the injuries for which appellants could recover damages. There was no estimate by any witness of the damages resulting to the cattle because of shortage of water during the three months covered by the contract in question, nor was there any evidence by which the jury could even infer the amount of such damages. This being the state of the record, the court had no alternative but to direct a verdict, as he did. This holding requires the overruling of appellants' sixth assignment of error.

[4] In their fifteenth, sixteenth, and seventeenth assignments of error appellants complain of the action of the court in excluding the testimony of appellant Freeman that the cattle did not "have sufficient water during the three summer months for them to grow and prosper"; that the "failure of water in the two wells supplied by windmills damaged" the cattle involved; that the lack of water at the two wells operated by windmills "caused these cattle to draw and not to mature, and caused them to be stunted in their growth during the summer months"; and that "the damage done to these cattle by being short of water was $10 a head." We have very carefully considered these assignments of error and have reached the conclusion that the testimony was properly excluded, and those assignments are, accordingly, overruled.

Appellants' eighth proposition purports to

be predicated upon their seventh assignment of error, which in turn complains of the refusal of appellants' "special charge No. 1." This special charge is not set out in appellants' brief, in substance or otherwise, nor is any reference by which it may be located in the record, nor is it shown that the allowance or offset asserted in the assignment was not embraced in the instructions and allowances under which the jury returned a directed verdict, as appellees claim was done. This proposition and assignment will be overruled.

To the extent of setting aside the order dismissing this appeal, appellants' motion for rehearing is granted, and the judgment is affirmed.